UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**Angel Santo JEREZ MATOS** | Crim. No. 19-113 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

The defendant, Angel Santo Jerez Matos, is serving a 64-month sentence for distribution of fentanyl. He seeks compassionate release pursuant to the First Step Act. (DE 64, 65) For the reasons stated herein, the motion is denied.

### I.   BACKGROUND

Mr. Matos pled guilty to a one-count information charging him with conspiracy to distribute and possess with intent to distribute more than 40 grams of fentanyl, contrary to 21 U.S.C. § 841(a) and (b)(1)(B), in violation of 21 U.S.C § 846. This Court sentenced Mr. Matos to 64 months' imprisonment and four years of supervised release, with special conditions including cooperation with U.S. Immigration and Customs enforcement.

Mr. Matos is incarcerated at FCI Williamsburg in South Carolina. His estimated release date, assuming good time credits, is May 27, 2022. *See* Federal inmate locator, https://www.bop.gov/inmateloc/ (inmate # 71215-050). The parties agree that upon completion of service of sentence, he will likely be deported.

The government concedes (*see* DE 66 at 2) that Mr. Matos has fulfilled the prerequisite of exhaustion of BOP remedies. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia,* 954 F.3d 594, 597 (3d Cir. 2020).

Now before the Court is Mr. Matos's motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A) (DE 64, supplemented

by letter, DE 65). The government has filed a brief, with exhibits, in opposition. (DE 66)

## II. MOTION FOR COMPASSIONATE RELEASE

### a. Legal Standards

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies

with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[1] That policy statement was enacted at a time when only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178,

---

[1] The application note lists three specific circumstances that qualify as extraordinary and compelling. Generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.' " *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, ⎯⎯ U.S. ⎯⎯, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore consider the grounds asserted by the defendant, whether or not specifically authorized by the Guideline policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if defendant were released.

### b. Extraordinary and compelling circumstances

Mr. Matos's First Step Act application for reduction of sentence rests on the danger to his health from a COVID-19 infection while in the institutional setting of FCI Williamsburg. My review of the submissions and the records supplied to the Court yields the conclusion that there are no extraordinary and

4

compelling medical circumstances here.

Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must consider (a) the likelihood that a COVID infection would have severe consequences for this particular person, and (b) the more general danger of infection at the institution where the person is incarcerated.

Mr. Matos has been vaccinated against COVID-19. He is approximately 63 years old. He cites tuberculosis and hypertension as the basis for a finding that his medical circumstances are extraordinary and compelling. As the government points out, the medical records also suggest obesity. There are currently no active infections detected at FCI Williamsburg. I discuss those factors in order.

### 1. Vaccination

Prison records disclose that Mr. Matos received both doses of the Pfizer COVID-19 vaccine: the first on June 16, 2021, and the second on July 16, 2021. (G 63)[2] His booster status is not stated.

The vaccines are highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarizes its effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**

---

[2] "G__" refers to page numbers in the prison medical records filed by the government at DE 66-1.

- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

I do not adopt the government's suggestion that vaccination absolutely precludes a finding of COVID-related extraordinary circumstances. I do agree with my colleagues, however, that vaccination is a highly relevant factor. *See generally United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022) (affirming denial of compassionate release based in part on vaccination, and approvingly citing cases denying compassionate release on basis of refusal to be vaccinated)*; United States v. Jaquwin Marlin,* No. CR 19-168 (SDW), 2021 WL 5711587, at *2 (D.N.J. Dec. 2, 2021) (declining to find extraordinary circumstances where defendant, although at higher risk as a result of obesity, had been vaccinated); *United States v. Dennison,* Crim. No. 09-402 (NLH), 2021 WL 5630296, at *2 (D.N.J. Dec. 1, 2021) (declining to find extraordinary circumstances where defendant had returned positive result for COVID infection and subsequently been vaccinated). I give Mr. Matos's vaccinated status great weight in assessing the likelihood that he will suffer a COVID-19 infection, or serious consequences therefrom.

I note in addition that vaccination has been widespread at the institution where Mr. Matos is incarcerated. At FCI Williamsburg, BOP reports, there have been 212 full vaccinations of staff, and 1467 full vaccinations of inmates.[3] https://www.bop.gov/coronavirus/. The resulting herd immunity tends to reduce further the risk of infection.

These vaccination-related factors, I find, weigh heavily in the balance against granting compassionate release based on the risk of COVID-19 infection. Where prisoners are protected by the vaccine, the cases have routinely denied relief despite the existence of such risk factors.

---

3   FCI Williamsburg houses 1626 inmates, including 81 inmates in a satellite camp facility. https://www.bop.gov/locations/institutions/wil/ The cumulative vaccination figures would not appear to account for turnover in the prison population.

**2. Medical risk factors**

The medical risk factors identified by the CDC must be understood, of course, in the context of vaccination, *supra*.

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  (updated as of Dec. 14, 2021) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 80% of COVID deaths. *Id*. Certain listed medical conditions are also recognized as risk factors. These, in abbreviated form, are Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

Mr. Matos, aged 63, is not an "older adult," and will not be one at the time of his presumptive release date. Still, he is approaching the age of 65. The risk of complications does not suddenly kick in at age 65, but increases with age.

Mr. Matos cites tuberculosis, a risk factor recognized by the CDC. It does not appear, however, that he has an active case. Prison medical records refer to a history of LTBI (latent tuberculosis infection) (G24), and in July 2021 he was prescribed meditation for LTBI prophylaxis (G12).[4] Before being transferred to

---

[4] Latent tuberculosis, as the name implies, is asymptomatic, but can develop into tuberculosis if prophylactic measures are not taken. *See* https://www.mayoclinic.org/diseases-conditions/tuberculosis/symptoms-causes/syc-20351250.

7

his current place of incarceration, Mr. Matos was screened for tuberculosis, and the results were negative. (G208)

Mr. Matos also cites hypertension, which appears on the CDC List as "possibly" a risk factor. Prison medical records disclose that, in the period October 2019–August 2021, Mr. Matos had the following blood pressure readings: 120/75, 143/80, 134/81, 138/80, 135/80, and 120/74 (G 48, 105, 116, 132). While elevated at times, these readings are not indicative of any severe condition.[5] It is, however, a condition that should be, and is being, controlled by medication. (G 27)

Mr. Matos does not specifically cite obesity, but CDC does recognize it as a risk factor. In the period from February 2019 through August 2021, Mr. Matos's body mass index ("BMI") was calculated at 36, 37, and 34.0–34.9 (G 010, 100, 102, 117). That is in the obese (BMI 30–40), but not severely obese (>40), range.

Even in the pre-vaccination era, release was regularly denied based on such chronic, controlled conditions, which are not out of the ordinary. *See United States v. Coleman*, 848 F. App'x 65, 66 (3d Cir. 2021) (upholding denial of release to inmate with "well managed" conditions of "asthma (moderate-severe), HIV, and hypertension"); *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (in pre-vaccine era, denying compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung); *United States v. Gideon*, No. 13-0429, 2020 WL 7351212, at *2 (D.N.J. Dec. 15, 2020) (denying compassionate release to an inmate with hypertension because he was not in the "high-risk category"); *United States v. Scalea*, No. 18- 00620, 2021 WL 395874, at *2 (D.N.J. Feb. 4, 2021) (denying

---

[5] Stage 1 hypertension. Stage 1 hypertension is a systolic pressure ranging from 130 to 139 mm Hg or a diastolic pressure ranging from 80 to 89 mm Hg.

Stage 2 hypertension. More-severe hypertension, stage 2 hypertension is a systolic pressure of 140 mm Hg or higher or a diastolic pressure of 90 mm Hg or higher.

Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.

8

compassionate release to an inmate with asthma and hypertension because he did not "fall within the class of people most vulnerable to the virus"); *United States v. Tull*, No. 15-622, 2020 WL 6381250, at *3 (D.N.J. Oct. 30, 2020) (collecting cases for the proposition that "[m]ultiple decisions in this District have denied compassionate release to inmates suffering from asthma, hypertension, and/or other health issues, despite the risk of COVID-19.").

In particular, "[m]ultiple courts in this District have denied compassionate release to inmates suffering from hypertension and obesity because this lower degree of risk does not establish extraordinary and compelling reasons to justify release on its own." *United States v. Manon*, No. CR 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022).[6] In particular, obesity and related impairments have been found insufficient to warrant compassionate release of a vaccinated inmate. *See, e.g., United States v. Jaquwin Marlin*, No. CR 19-168 (SDW), 2021 WL 5711587, at *2 (D.N.J. Dec. 2, 2021) (declining to find extraordinary circumstances where defendant, although at higher risk as a result of obesity, had been vaccinated); *United States v. Brashear*, No. CR 15-00636 (SDW), 2021 WL 5239119, at *3 (D.N.J. Nov. 10, 2021) (denying motion of 61-year-old woman with hypertension and a BMI between 30 and 31, and noting "Despite the risk of COVID-19, multiple decisions in the Third Circuit, and multiple decisions in this District, have denied compassionate release to inmates suffering from obesity, hypertension, and/or other health issues.").

In short, these are chronic, fairly routine health conditions, which do not

---

6  Citing *United States v. Wax*, Crim. No. 14-251, 2020 WL 3468219, at *3 (D.N.J. June 25, 2020) (denying defendant's motion for compassionate release for lack of an extraordinary and compelling reason, even though he suffered from hypertension and obesity, because he was receiving regular and consistent medical care); *United States v. Falci*, Crim. No. 17-228, 2020 WL 3410914, at *1, *4 (D.N.J. June 22, 2020) (denying motion for compassionate release where defendant was 60 years old and suffered from obesity, hypertension, and other health issues); *United States v. Alexander*, Crim. No. 19-32, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying compassionate release where defendant suffered from hypertension and obesity because defendant's health conditions are not sufficiently severe and medical records showed that BOP was "adequately managing defendant's medical care").

present extraordinary and compelling circumstances.

I move on to consider the likelihood of contracting COVID-19 at FCI Williamsburg, and, in particular, whether the prison environment creates a particular risk that Mr. Matos will suffer serious consequences from a COVID infection. The pandemic caught the prison system, as it caught society, on the back foot, and it took some time to bring cases under control. The prison system instituted extraordinary containment measures, which had some effect. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp  In early to mid-2021, of course, the vaccine became available.

FCI Williamsburg is a medium-security institution that houses approximately 1626 inmates, including 81 inmates at an adjacent camp facility. https://www.bop.gov/locations/institutions/wil/. Current and cumulative figures for COVID-19 infections are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 0 | 0 | 3 | 0 | 260 | 127 |

https://www.bop.gov/coronavirus/

To be sure, the "recovered" figures reveal that over the past two years there were significant positive COVID test results among the inmates and staff. Tragically, three deaths resulted. Cases have declined steeply, however. Currently, the facility reports no positive test results among inmates or staff.

Prison conditions, then, do not suggest a severe risk of infection, or serious consequences therefrom.

In sum, neither Mr. Matos's personal situation nor conditions at FCI Williamsburg would support a finding of compelling and exceptional circumstances.[7]

---

[7] In a supplemental letter, Mr. Matos states that his daughter in Mexico suffers from an ailment and that, if released, he would be willing to travel to Mexico and donate a kidney to help her. (DE 65) Particulars are lacking. There is no medical evidence. There is no concrete plan. There is no evidence that he is a match for his daughter; he states only that he "may be" an eligible donor. At any rate, the federal prison system has a furlough program for the purpose of organ donation. (DE 66-2)

10

### 3. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the factors under 18 U.S.C. § 3553(a) would weigh against an order of release. I have considered those factors, but discuss them only briefly in light of the analysis above.

The nature of the offense is serious, involving the distribution of fentanyl in significant amounts as part of an international trafficking organization. It appears that Mr. Matos exercised a certain amount of discretion and authority in that organization. The dangerousness of fentanyl need not be belabored. Now, as before, full service of sentence is required to serve the goals of punishment, deterrence, and protection of the public.

While it is true that most of the sentence has been served, that is not extrordinary; it could be said of all inmates at a certain point. The record discloses a non-serious disciplinary history (G 3), and a prison assessment of low recidivism risk (DE 64 at 3). Mr. Matos stresses that his prior criminal record is nonviolent and states that he is rehabilitated. I take that into account, but it is insufficient to outweigh the other factors.

Even if Mr. Matos's circumstances were extraordinary and compelling, which I do not find to be the case, compassionate release would be denied because it would undermine the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).[8]

---

[8] To the extent the motion may be seeking transfer to home confinement, it must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). If the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above. And I note, of course, that there is an immigration detainer.

## **ORDER**

**IT IS THEREFORE** this 9th day of March, 2022,

**ORDERED** that the motion for compassionate release (DE 64) is DENIED. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Mr. Matos, by regular first-class mail.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**